Good morning. May it please the Court, Benjamin Wiesinger on behalf of the Petitioner. I am from Berkeley, California. I was born and married student housing at UC Berkeley. I now live in Phoenix, Arizona, specifically the Estrella Village of Phoenix, Arizona. Now you know a little bit about me. I've just self-identified myself with two neighborhoods. Human beings naturally do this. Two people from San Francisco meet for the first time, say at a singles bar. One of them might say, oh, I'm from Balboa Park. The other one answers, oh, I'm from North Beach. In this case, the neighborhood is the particular social group. The idea that somehow Soriano v. Holder, a matter of CA, delimits this or takes care of this argument is not supported by either decision. The fact is that this group of neighbors who petitioned the police became a already were, excuse me, a particular social group, and the neighbors who specifically signed the petition, any one of those folks can now show a nexus from their neighborhood to a well-founded fear. Counsel, have you looked at Henriquez-Rivas? I have, Your Honor. You have not? I have, yes, I have. You have. Okay. How does Henriquez-Rivas affect your case? It affects it in two ways. First, the social visibility requirement is not necessarily on site, very much like the social group of homosexual people. We can't look at a person or we can't necessarily look at a person and say, well, he's obviously a homosexual, he belongs in that social group. They self-identify as a homosexual or as a family clan. But if I live in North Beach, how do you identify, how can you tell that I'm from North Beach? How do I self-identify being North Beach and then identify myself that way without having something conspicuous? You don't need anything conspicuous, Your Honor. The fact that you're from a particular part of town makes you have something in common with those other folks. You went to the same grade school. You played at the same parks. You have shared experiences, just like a family clan, just like the social group. That's a very, very broad reading of social group, and that suggests, you know, sociologists would come in and say, well, of course, we all belong to these social groups. And if that's true, then there isn't anybody who can't make a social group argument. That may, in fact, be the case, Your Honor. But it depends on the particular facts and circumstances of each individual case. Why is this social group important for this case? This particular social group is limited to this one neighborhood. It's not like it's entirely Alcapulco. This one neighborhood is the one neighborhood that is being threatened with harm or, if it rises to that level, persecution. And you don't need to have any of that. That suggests you can move to another neighborhood in Mexico and it wouldn't be a problem, doesn't it? It would suggest that, Your Honor. However, the evidence in the record also suggests that the Petitioner, my client, did not feel safe anywhere, not necessarily because of the men who came into her home, but because of who she petitioned. She brought this to a particular police captain, and she clearly demonstrated an extreme fear of even mentioning his name on the record. If it's an actual police officer, maybe even a lieutenant or captain, forgive me, I'm not exactly certain what she referred to him as, then it's not unreasonable for her to feel afraid anywhere in Mexico if the cartels can get to that police officer, a high-ranking. But she fears being anyplace in Mexico because she's from a particular neighborhood in Alcapulco? Because she knows that the police can't help her. And, in fact, petitioning the police is going to get you killed. That's what this experience has taught her and taught her neighbor. Who was killed? Nobody was killed, thankfully. But you said – state that point again. I thought you said that it will teach you that if you go to the police, you'll get killed. Could get killed. She went to the police, 6 hours later, 3 men are in her house with guns on her – drawn to her head. The reasonable assumption is that – Maybe or maybe not. Her story's morphed, hasn't it? It has. And – That affects her credibility, doesn't it? That's the other threshold issue, the nexus and credibility. Her fear – I mean, fear is so subjective. That can't be an objective – are you saying that identifies the group, is that they're all united by – they live in the same neighborhood and they're all afraid of the police? Not necessarily, but – yes and no. Because you understand, if I'm an illegal alien here and I go, oh, wait, I'm afraid. Now, prove I'm not afraid. Right. And – I mean, it's so subjective. Everybody's afraid. There is always a subjective component to withholding and CAT claims and asylum claims. And then the next question is, is that subjective fear objectively reasonable? And in this case, it is because of the nexus to – the neighborhood and the neighbors who signed the petition can demonstrate that nexus. They have the subjective fear because they see or they know what happened to my client, and they know that her other friend, the other neighbor, has fled to Canada based upon my client's testimony. They know what happened to these two folks. The other neighbors. And so they are now a social group for purposes of withholding, for purposes of asylum and withholding. That's the same definition. To your point about my client's credibility, what we have here and what we have in many, many cases like this are no less than five different witness statements. Five. The Border Patrol interview, the reasonable fear interview, the I-589 written application, my client's testimony, and her husband's testimony. We should be more surprised and more suspicious of credibility if those are five exactly the same stories. But they certainly improve over time. And her memory improves, and she comes up with additional really important details. At one point, she says, no, she didn't know who they were. She just – she didn't know whether they were from the gang or whether they were from the police. And then later on, she's very definite. Oh, these were police then. They were wearing uniforms. Once you start improving that story, then all of a sudden the IJ says, I'm not sure what to believe. It's possible you've had something happen to you here. The question is, it's just not clear what. And, indeed, there is no definitive evidence exactly what – who those men were. She identified themselves consistently by the clothes they wore and what they said. Okay? But it isn't the story itself. It's the way she's told it. A person is looking at an individual, determining whether they tell the truth. It isn't the end story. It's the inconsistencies, and whether it rings in your head with those inconsistencies, the person is not being truthful. So we here, sitting up there, never having seen the person in face, we look and see, is the IJ – can the determination of the IJ be sustained? It's awfully hard, it seems to me, when an IJ sees all of these inconsistencies, which are very material, to say that we're compelled, as the cases say, we're compelled to say the IJ was wrong. How can we push it that far? Because the IJ said on the record that he actually believed that this incident happened, point one. Point two, the inconsistencies are explained, and they're not substantial inconsistencies. Who exactly the men were is a part of her testimony that evolved over time, because she had been in detention for, I believe it was close to nine months, thinking about her story, reading up the evidence that we've submitted, learning about how maybe the Zetas are involved with the police. And so she petitions the police. Next day, three men look like they're dressed military or at least uniform style. She makes the connection that they're Zetas or they're a member of this gang. So in this Court's recent decision of Lee v. Holder, the Court actually distinguished between material falsehoods and inconsistencies and a story that evolves naturally over time, after a witness's time to reflect, after a witness's time to read up on her own story, on what's going on in the newspaper accounts, what was going on in Acapulco at the time, are horrendous. And they have no doubt affected her recollection of the events. Again, we ought to be more surprised if her story never changed. We should be more surprised if that happens. The inconsistencies that the judge found are simply not enough to find an entire story not credible, because we have to remember the most important question before we enter in adverse credibility is, what if we're wrong? Roberts, the fact that you think that we should be more, that we should be surprised that there are more changes in stories as they're retold over time, is that an argument that we're compelled to reverse the IJ? No, not in this case, because there wasn't any finding of that effect. The reversal of the judge's decision comes where the consistencies that the judge found are not actually inconsistencies, okay? They're just variations on the same story. In the asylum interview, she was never actually asked about the harm. She was asked, did you experience harm? She said yes, and she began to describe the whole story. The interviewer never actually asked her, did anybody actually physically touch you? Never asked that question. She said she didn't get a chance to tell the whole story until she got before the immigration judge. She, at one point, she says, in part of her, this is the, let's see, this is her credible, credible fear interview. Yes. She describes, she's very careful, shoes, dark T-shirts, shoes like boots. Yes. How do you know these men were police officers? I believe they were, because who else would have known but I made a complaint? Did they ever identify themselves as police officers? No. By the time she gets in front of the IJ, she says they were wearing police uniforms. Police-type uniforms. I mean, I think that's splitting hairs, Your Honor, with all due respect. But she consistently identifies what they were wearing each time she gets a chance. How do you know they were police officers? This is, I'm now reading a testimony for the IJ. They were, they was wearing, they was wearing uniforms. Were they wearing masks? Yes. But they were wearing police uniforms? Yeah. They was wearing police uniforms. Yes, Your Honor. And that is one of the details that's actually consistent every time she gets a chance to tell the story. We have to take Schrester v. Holder. We have to consider the totality of the circumstances. The judge completely ignored the, in his credibility determination, he ignored all these details that are very, very consistent throughout these, you know, four different chances she has to tell a story. We can't cherry-pick from the record what we find believable and what we find not and we can't use maybe one or two or three minor inconsistencies, the time she spent, the men spent in her house, whether she was grabbed by the neck or not. We can't use those tiny inconsistencies to find an entire story not credible, because otherwise we're going to be deporting a lot of people who are going to face a lot of serious harm. Do you want to reserve any of your time? I do, Your Honor. Please record. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Kylie Cain, appearing on behalf of the Attorney General. I just wanted to first maybe inquire whether you'd like me to address the issue of whether she's eligible for asylum, just because of the issue of homeland security. Yes, I'm sorry. Just because it didn't come up in Mr. Weisinger's presentation, but it is a very important issue to homeland security. Yes. Okay. Let me start there, then. It is really the government's position that Ms. Zarate's case implicates what consequences attach to an alien's decision to legally reenter the country after being formally removed. And it is the position of the government that the reinstatement's bar to – sweeping bar to any relief also applies to asylum. And I would just say that the Court doesn't have to start from whole cloth on this. There have been several challenges to the reinstatement statutes over the years, including the one cited in the government's brief, which is the Padilla decision, where in that case, the alien was actually raising the challenge of conflict between adjustment of status, which is a form of relief under the INA, and the reinstatement statute's bar to any relief under the INA. And there, the Court determined that it's actually the reinstatement statute that would control, even though the particular statute that the alien was seeking, relief under, came later in time. And that is because the Court took notice of the fact that in the, what are called the Life Act Amendments of 2000, which extended the form of relief that the alien was seeking, Congress actually amended that particular statute to exempt certain forms of adjustment of status from the reinstatement bar sweeping bar to any relief. And in this case, is the 1231A5, isn't that the later adopted statute in this case? Yes. That's the current statute, and that's the one that was adopted in the reforms in 1999. So, so the government's position is that if you've been, if you've been kicked out of the country, that even if you're being persecuted just openly in a foreign country, on the basis of your political identification, that you're going to have to go someplace else to get asylum. You cannot come back here and apply for asylum. Actually, Your Honor, and I will admit that the government's brief doesn't make this quite clear. That's actually not true. Ms. Zarate had an opportunity to apply for asylum in the United States. She could have presented herself at the border and said, I'm a refugee, I'm being persecuted in Mexico, and she would have been processed through what's called expedited removal. Now, that's exactly what happened to her in 2001. So, so the answer, so the answer to my question about a hypothetical person who's being persecuted clearly on the basis of their, of their political affiliation is that they have to present themselves at the border, put up their hands and say, look, I've been booted out once before. I am here today seeking asylum in the United States. If they, if they come back in as she did, surreptitiously, then they are barred from seeking relief. They are barred from seeking relief in the event that DHS chooses to put her into reinstated proceedings. So it's not even a categorical yes to your second question. DHS can actually choose to put her back in removal proceedings under Section 1229A. That's sort of the normal removal process that we're all used to seeing. Instead of reinstatement proceedings, they actually have a decision to make there. It's not the mere fact of per se that she came in illegally after being ordered removed. It's that the Department of Homeland Security placed her into these sort of expedited  is to expedite the process of removal of aliens who have already been removed. Then what do we do with this any alien statement in 1158A.3? The argument your adversary makes that any alien means any alien, that's a very difficult argument to combat. It means what it says, alien means any alien. Why doesn't that trump any other statute? Well, there are several reasons. The first I've already alluded to, which is that the reinstatement statute's bar to even allowing an alien to apply for relief came after the asylum statute. So therefore, you know, the government is arguing that a later in time more specific statute would govern. But even more than that, we see that within the asylum statute itself, there are several bars for aliens who are not allowed, not eligible to receive asylum. So reading the statute, the provision of the asylum statute that says irrespective of an alien status. Receive, any alien here is apply, isn't it? I'm sorry. Isn't it, isn't the statute say any alien can apply? Any alien can apply. Yeah, that's what the. You're talking about whether any alien can receive. Right. So there's, there seems to me to be a conflict here. Has any case, written case, opinion from a court of appeals taken on what appears to be a facial conflict? In, in respect to a conflict itself, no. But I would point to this court's recent decision, 2011. It's called Chay-Ixcot. Padilla? No, it's Chay-Ixcot v. Holder. It's 646F3-1202. It's a decision. Did you cite that in your brief? No. It came after the briefs, Your Honor. How do you spell the name of it? I'm sorry. Yeah. In the decision, they refer to the alien's last name as C-H-A-Y. Well, you can, you can give the citation to the clerk and she'll give it to us. I will do that, Your Honor. The reason that I didn't submit a 28-J, this, this isn't a, a facial challenge, as Your Honor says. So it's not directly on point. But what I'm taking away from this decision, this is a case where the court was addressing whether the reinstatement statute as it currently exists is impermissibly retroactive as applied to an alien who was ordered deported, was in fact deported, came back over, and applied for asylum. All of that conduct taking place prior to the, the reinstatement statute in its current form. And the reason that I'm saying it's important for this issue is that in that decision, the court found that the legal disability that attaches to somebody in that instance is the categorical bar to asylum. So it's a, it's a condition precedent for the court's decision in that case to find that there is this bar to asylum. Otherwise, they would not have found that it was impermissibly retroactive to apply the new reinstatement statute to the conduct of the alien that took place prior to the statute. Because what happened is the reinstatement statute stripped the alien of his ability to have his asylum application adjudicated, even though that application was filed before the reinstatement bar was enacted by Congress. So there's a legal question. Roberts, that sounds like an important case. Is that out of our circuit? It is, Your Honor, 2011. So it's pretty recent. It took place after the briefing. Yeah, I missed that one. I was thinking about Padilla, because although Padilla is indirectly on point, its reasoning certainly gets to the same position that you were in. Well. I thought that's the case you'd be citing. It is, but it doesn't address sort of what you were getting at a moment ago, because the adjustment of status statute doesn't say any alien present in the United States can apply. So it's – it is instructive, absolutely, but it doesn't quite get to that question about the language of the asylum statute and whether that, in fact, conflicts with the reinstatement statute's bar to applying for relief at all. Yeah, it's reasoning you can reason from. But you're saying that this case – unfortunately, I haven't read it. We have a lot of cases that come out that it's difficult to keep up with all of them unless they're cited to us. But your indication is that if I read that case, this will not be a reasoning case, but a direct holding, obviating what I thought was a conflict. Well, I guess what I'm saying is that the only way the Court could have reached the holding it reached in this Che decision was to find that there was a categorical bar to asylum for illegal reentrants who are placed into reinstatement proceedings, that that was a condition precedent to its holding. It was necessary for its holding. So I find that instructive because if the Court could have found that there wasn't a categorical bar to asylum, it wouldn't have found that the application of the reinstatement statute was impermissibly retroactively applied to Mr. Che. So I think it's – it gets us the other half. Padilla is sort of the reasoning part of it, and Che comes in and fills in that this Court views the reinstatement bar as a categorical bar to even applying for this form of relief. Counsel, the I.J. treated this as a withholding-only proceeding. Right. If we thought that there was – if we thought that there was – that Mr. Zarate was entitled to apply for asylum, would it make any difference here since the withholding standard is higher than – generally considered to be higher than the asylum statute? That is, if we uphold the I.J.'s holding with – or the B.I.'s holding with respect to withholding, then doesn't it moot any claim about asylum? Well, typically – typically, you don't go the reverse direction. I know we usually don't, but this is an unusual – it's a little bit of an unusual case. Backwards, yeah. Well, in this case, though, both of the determinations made by the immigration judge, the credibility determination and alternatively the nexus finding, would apply equally to asylum. So in this particular case, it's not a level of burden of proof issue where withholding is higher and asylum is lower. Both of the findings of the immigration judge would apply equally to asylum. So if you said this case – So does that – does that moot the need for this Court to decide the statutory question? It could, because as applied to her, it would make no difference. That's – that's an interesting point. Whether she's allowed to apply, whether that's a stand-alone right that the Court would want to address, is a little bit distinct about whether she's eligible. I think that's what Judge Wallace was getting at a moment ago. Because remember that the reinstatement bar actually bars an alien from even applying for relief. You know, and thinking about this, asylum claims and withholding claims, both under the Act and under Convention Against Torture, they're all the same materials. They're all filed on an asylum application. And you see that in this case, too. Even though she was in withholding of removal-only proceedings, she filed an asylum application, because that's how you get your claims before the Court. There's no separate withholding of removal application. So the same evidence would have been presented in this case, whether the asylum – excuse me, the immigration judge was adjudicating her asylum application or not. It's the same evidence. It's the same testimony. And here, the same findings would have been applied to asylum the way that they were for withholding. So in, you know, in that respect, I think regarding eligibility, it absolutely moots her claim as applied to her. Whether she's allowed to apply, I'm not sure if that's really just a difference without a – you know. I'm not sure that it's material to the conflict. I don't – I'm not sure what to do with that, because there's not a lot of places in the INA where someone is barred from even submitting an application. And that's what the reinstatement bar says, not allowed to apply and not eligible to receive. So it's kind of a dual – dual requirement. I would like to take a moment to address credibility, if you're – okay. I just wanted to respond to some things. I think that, you know, Mr. Weissinger cited this Lee decision about how when you – when there's time to reflect, an alien's testimony can sort of fill in some of the details that might have been lost earlier in the process. But what the immigration judge is really identifying here is that the story is morphing in a way that sort of makes her eligible for asylum, whereas the thing that's the – her version of events, the first version when she came in, is the one that's closest in time to the actual event. And that's the one where she says, I'm afraid of kidnappers. They know my husband's American. They know we have money. And she's afraid – you know, and she specifically said that there were drug dealers near her home. That's the version of events that took place about a week after the event actually happened. And I think that's the one where the immigration judge is targeting that and saying, it isn't that we don't believe her at all. There's – you know, it's not saying that she's lying that this happened. It's just that over time, the events are being embellished in a way that makes her eligible potentially for withholding of removal. And that's the troubling part of it. It's not the filling in of details. It's the filling in of details that are sort of necessary for her to establish a claim. And that's the – that's where the immigration judge takes issue and declines to fully credit her testimony. And I think when we have sort of a partial credibility determination like this, where you don't have the immigration judge saying she's fabricating things. Actually, the immigration judge is giving credence to much of her version of events. It's just that the version of events don't entitle her to have the United States protect her from the Mexican government or forces that the Mexican government might not be able to control. And that's a bold statement to make, that the United States government is – you know, is under a mandatory obligation for withholding of removal to protect her from the Mexican government and or forces that they cannot control. And I think the immigration judge really just found that she, under the REAL-ID Act, has to affirmatively show her credibility. And here it just wasn't quite there because of the morphing of story over time. Regarding a particular social group, I just wanted to quickly in my minute and a half here address Enriquez-Rivas, of course, very important decision coming out of the en banc court. And I just wanted to stress that in that case, they were also examining this board decision of matter of CA regarding confidential informant. And I just want to stress that the board – excuse me, the en banc court did not alter matter of CA's holding. What they found was that matter of CA was not properly applied by the board to Ms. Enriquez-Rivas' case. Here we have a proper application. And so Enriquez-Rivas doesn't provide too much in the way of illuminating how this case should go. It's really back to the board's analysis in matter of CA. And the problem here is the social visibility aspect of the claim. And I just wanted to sort of push back a little bit against Mr. Weisinger's sort of formulation of neighborhoods as a social group. Because remember, although social visibility is really the problem in this case, immutability or fundamental characteristics are part of a social group claim. The problem with a neighborhood formulation is that it's not immutable. You just move. Then you're part of a new social group, right? It's very dependent on time and place and circumstance. It's not something that's so fundamental to a person that they shouldn't be asked to change it or that they may change it themselves if they relocate to a different part of the country. That's really the problem with a neighborhood formulation of social group. Now, Ms. Cerrete's problem is that there's just no indication in the record, recalling that it's her burden to meet withholding of removal, to show how society neighbors petitioning the police, and whether any part of the greater society recognizes that group at all or knows about that group at all. So it's that aspect of the social visibility test that's really lacking in her case. My time has expired, so, okay. Thank you very much, Your Honors. Roberts. Roberts. Thank you, Ms. Cain. Mr. Weisinger, you've got some time reserved. Weisinger. Before Ms. Cerrete ever gave any statements to Border Patrol, we have evidence that supports her claim. One, Mr. Miller testified that he knew about the petition being signed by her neighbors. So the petition precedes any testimony. Second, we have what's known in criminal court as an excited utterance, the phone call immediately after three masked men came at her house and threatened her. We have those two pieces of evidence. But you lasted for two hours or 15 minutes or two hours, depending on which one you believe.  I mean, you weren't there, so you don't know, and neither would the husband wasn't there, so he doesn't know. He's relying on what she said. But his testimony, it was 15 minutes. Her testimony was it was two hours, right? And they used violence, held her by the neck, right? Yes. That was her story, two hours. Husband says 15 minutes. Yes. And that is an inconsistency. You're right, Your Honor. But it's not necessarily material to the claim. How long it lasted is not as important as that it happened. In my estimation. How do you respond to what counsel says about the improvement of the story? In other words, she tells a story and then, well, that's not good enough. Well, then let me improve it. Oh, that's better. Well, let me improve it again. And now we come down to the third version, which involves the two hours or the 15-minute encounter, depending on whom you believe. The level of harm didn't improve. The intruders never suddenly self-identified as members of the Mexican Army. So we don't have any actually material improvements necessarily that would buttress her actual claim for relief. They were and always continue to be three men dressed similarly, dressed in military or police outfits. But it started off, they threatened her. Correct. Right. And then they even talked about extorting money. They were going to kidnap her. And then the second version of her story was that they criticized her for you shouldn't have signed this petition. You know, you can get in trouble, blah, blah, blah. And then the third time, finally, she's using violence. So they're using violence. To go to the first part, I would submit that that CBP interview is simply far too brief to make any accurate credibility determinations. And the purpose of the CBP interview is limited to, okay, what should we do with this person? Should we just boot her back out, or should she be referred to an asylum officer? So the limited purpose and the limited duration of that interview I don't think should be any part of the immigration judge's decision. Unfortunately, he used it. Again, we have, in these types of cases, we will always have different statements. And you can pick and choose. But if your time is limited, you aren't going to say, well, I got up this morning and I didn't comb my hair and got the newspaper, and then, no, you're going to say, here's the heart of it. These people came in and they threatened me. That's what these people, I'm in danger here. So you don't say, you know, they came in and, you know, they talked about my, you know, my husband's an American citizen. They talked about that. And they said they were kidnappers and they might extort money and blah, blah, blah. I mean, so it's not simply her time was short that she said, well, I've got some story to tell you. And they said, okay, your time's up. Get out. And yet still what she told them is not necessarily inconsistent with what actually happened. I see my time is up. So do we have any more questions? I don't think so. Thank you very much. Thank you very much, Your Honor. We thank counsel for the argument. The case is submitted.
judges: Mahan, Wallace, Bybee